**No. 22-1757**

# In the
# United States Court of Appeals
# For the Third Circuit

JOSEPH RIAD & RIAD HOLDINGS, INC.,

*Plaintiffs-Appellants,*

v.

WELLS FARGO BANK, N.A.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
The Honorable Chad F. Kenney, District Judge
Case No. 2:19-cv-04292

**BRIEF OF APPELLEE**

Ashley P. Peterson
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-1190
F: (804) 698-2091
apeterson@mcguirewoods.com

Jarrod D. Shaw
MCGUIREWOODS LLP
260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222
T: (412) 667-7907
F: (412) 402-4193
jshaw@mcguirewoods.com

*Counsel for Appellee Wells Fargo Bank, N.A.*

## United States Court of Appeals for the Third Circuit

### <u>Corporate Disclosure Statement and<br>Statement of Financial Interest</u>

No. <u>22-1757</u>

Joseph Riad, et al

v.

Wells Fargo Bank, N.A.

<u>Instructions</u>

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

## Wells Fargo Bank, N.A.
(Name of Party)

   1) For non-governmental corporate parties please list all parent corporations: Wells Fargo Bank, N.A. is 100% owned by Wells Fargo Holdings, LLC, and Wells Fargo Holdings, LLC is 100% owned by Wells Fargo & Company.

   2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

Wells Fargo & Company (NYSE: WFC) indirectly owns 100% of the stock of Wells Fargo Bank, N.A. Except for Wells Fargo & Company, no publicly traded company owns 10% or more of the stock of Wells Fargo Bank, N.A.

   3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

N/A

   4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

## /s/ Jarrod D. Shaw
(Signature of Counsel or Party)

Dated: 10/13/2022

**rev: 09/2014**                    (Page 2 of 2)

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE..................................................................2

I.    Relevant Facts.................................................................................2

II.   Procedural History ......................................................................10

III.  Rulings Presented for Review ....................................................13

SUMMARY OF THE ARGUMENT ......................................................13

STANDARD OF REVIEW ....................................................................15

ARGUMENT ..........................................................................................16

I.    Riad's claims are time-barred......................................................16

    A.    The limitations periods on Riad's wire transfer claims were not equitably estopped by any purported "promise" by the Bank. ..........17

    B.    The limitations periods on Riad's cashier's check, deposit, and debit claims were not tolled by the "discovery rule." ........................24

II.   Several of Riad's claims also fail on the merits. ..........................28

    A.    The undisputed record evidence—including the testimony of Riad and his expert—proves Riad suffered no losses related to the cashier's checks, deposits, or debit transactions. ..........................28

    B.    Riad's breach of contract claim fails because there is no contract. ............................................................................................30

CONCLUSION .......................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Azur v. Chase Bank, USA,*
601 F.3d 212 (3d Cir. 2010) .......................................................................15, 16

*Bohus v. Beloff,*
950 F.2d 919 (3d Cir. 1991) ..................................................................24, 25, 27

*Bush v. City of Pittsburgh,*
813 F. App'x 767 (3d Cir. 2020) ........................................................................12

*In re Chavin,*
150 F.3d 726 (7th Cir. 1998) ..............................................................................26

*Colbert v. Boazzo,*
45 Pa. D. & C. 4th 370 (Pa. Ct. Com. Pleas 2000).....................................21, 22

*CoreStates Bank, N.A. v. Cutillo,*
723 A.2d 1053 (Pa. Super. Ct. 1999)..................................................................30

*Dep't of Pub. Welfare v. Soffer,*
544 A.2d 1109 (Pa. Commw. Ct. 1988) .............................................................22

*Dep't of Pub. Welfare v. UEC, Inc.,*
397 A.2d 779 (Pa. 1979)...............................................................................21, 22

*Fine v. Checcio,*
870 A.2d 850 (Pa. 2005).................................................... 15, 16, 18, 19, 23, 25

*Kreielsheimer v. Berryman,*
147 P. 871 (Wash. 1915) ....................................................................................22

*Langdon v. Langdon,*
117 P.2d 371 (Cal. App. 1941) ..........................................................................22

*Mest v. Cabot Corp.,*
449 F.3d 502 (3d Cir. 2006) ........................................................................23, 25

*Nesbitt v. Erie Coach Co.,*
204 A.2d 473 (Pa. 1964)...............................................14, 18, 20, 21, 22

iv

*Nicini v. Morra*,
212 F.3d 798 (3d Cir. 2000) .................................................15, 16, 28

*Pinnix v. Fielding Inst.*,
53 F. App'x 204 (3rd Cir. 2002)...........................................................31

*Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*,
468 A.2d 468 (Pa. 1983) .....................................................................17

*Ramara, Inc. v. Westfield Ins. Co.*,
814 F.3d 660 (3d Cir. 2016) ...............................................................16

*Razak v. Uber Techs., Inc.*,
951 F.3d 137 (3d Cir. 2020) ...............................................................15

*Rice v. Diocese of Altoona-Johnstown*,
255 A.3d 237 (Pa. 2021)................................................................18, 19

*Rice v. Granite Sch. Dist.*,
456 P.2d 159 (Utah 1969)...................................................................22

*Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*,
172 F.3d 238 (3d Cir. 1999) ...............................................................15

*United States v. Duke*,
229 F.3d 627 (7th Cir. 2000) ..............................................................25

*United States v. Premises Known as 717 S. Woodward St., Allentown, Pa.*,
2 F.3d 529 (3d Cir. 1993) ...................................................................26

*Wilson v. El-Daief*,
964 A.2d 354 (Pa. 2009)...............................................................25, 27

**Rule**

Fed. R. Civ. P. 56(c)...........................................................................15

**INTRODUCTION**

Appellant Joseph Riad is a wealthy international businessman with a long history of using litigation to vindicate perceived wrongs. He was also a customer of Appellee Wells Fargo Bank, N.A. ("Wells Fargo" or "Bank") and its predecessors for decades.

In September 2019, Riad sued Wells Fargo in the district court, asserting Pennsylvania state-law claims based on banking transactions that allegedly took place nearly a decade earlier, beginning in 2010. Riad concedes his claims should be barred by the applicable statutes of limitations, the longest of which is six years. He insists that two tolling doctrines—equitable estoppel and the discovery rule— save his claims. The district court disagreed, granting summary judgment in Wells Fargo's favor on statute of limitations grounds.

This Court should affirm. Tolling doctrines like equitable estoppel and the discovery rule protect parties who, despite their own best efforts, cannot timely discover their injuries or pursue legal remedies. The undisputed evidence proves that Riad knew or should have known about his alleged injuries at or near the time they occurred. It also shows that Riad failed to act with reasonable diligence to protect his legal rights. Under these circumstances, the statutes of limitations should not be tolled.

## STATEMENT OF THE ISSUES

1. Whether Wells Fargo's alleged "promises" that it was "investigating" allegedly unauthorized wire transfers constitute "fraud or concealment" that equitably estop the Bank from asserting the statute of limitations as a defense to Riad's wire transfer claims.  (No.)

2. Whether the statutes of limitations on Riad's cashier's check, deposit, and debit claims were tolled under Pennsylvania's "discovery rule," where the undisputed evidence reflects that Riad knew or should have known about these alleged errors soon after they occurred.  (No.)

3. Whether Wells Fargo is entitled to summary judgment on Riad's cashier's check, deposit, and debit claims because undisputed evidence proves that Riad suffered no losses related to these transactions.  (Yes.)

4. Whether Wells Fargo is entitled to summary judgment on Riad's breach of contract claim because undisputed evidence proves that the parties had no contract.  (Yes.)

## STATEMENT OF THE CASE

### I.    Relevant Facts

Riad is a wealthy international businessman.  He has a degree in computer science and has worked in the commodities business for many years.  JA112-117. He owns at least half a dozen commercial and agricultural properties, JA125-128, and he is the Chairman of Riad Holdings and Trust, a privately held family trust based in Egypt and organized under Egyptian law.  JA117-121.  According to Riad, Riad Holdings and Trust is worth more than $100 million.  JA121.

Riad's shrewd business acumen is well-documented.  For example, in 2018, in connection with finding that Riad had committed fraud and "schemed" to exploit

a family lacking similar sophistication, a Pennsylvania state court emphasized that "Riad is a sophisticated businessman," a commodities trader, the chair of a business that purchases and refines gold, and the owner of a great deal of commercial real estate. JA275. Riad is also a frequent and aggressive litigant. *See, e.g.*, *Riad v. United States*, E.D. Pa. Civil Action No. 11-7777 (claim involving alleged misappropriation by the United States Government of twenty-five bonds allegedly worth $25 billion) (dismissed as untimely); *Riad v. Hoban*, E.D. Pa. Civil Action No. 13-3045 (civil rights action based on arrest where charges were later dropped); *Riad v. LW Wireless, Inc.*, E.D. Pa. Civil Action No. 13-2596 (fraud claims); *Riad v. Solutions Acquisitions Logistics & Training, LLC*, E.D. Pa. Civil Action No. 15-4669 (fraud claims involving former business partners); *Riad v. Porsche Cars North America, Inc.*, E.D. Pa. Civil Action No. 18-5175 (personal injury claims); *Riad v. Watkins*, Chester Cnty. Court of Common Pleas No. 2014-09170 (rent and eviction).

Riad incorporated Appellant Riad Holdings, Inc. under Delaware law in 2012. JA121. Riad created this entity because he "wanted to do business under that name"; however, he testified that Riad Holdings has never conducted any business or owned any assets. JA122. Bank records reflect that Riad Holdings held a Wells Fargo business checking account ending in -1413 ("1413 Account") between September 7, 2010 and January 10, 2012. JA92, JA224.

Riad began banking at a Wells Fargo branch in Kennett Square, Pennsylvania in the 1990s.[1]  Riad owned several Wells Fargo deposit accounts, *see* JA224, including one ending in -7764 ("7764 Account"), which he held jointly with his former common-law spouse, Michelle Schepperd, JA90.  During the relevant period, Riad visited the Kennett Square branch "at least twice a week" to check his account balances, which he would view on the computer screen of branch manager Triandos "Tri" Randolph.  JA441.

Two categories of transactions are relevant on appeal:

**Allegedly Unauthorized Wire Transfers.**  Riad challenges as unauthorized approximately $1 million in wire transfers sent from the 1413 Account between November 23, 2010 and January 18, 2011.  *See* JA4-5, JA93-94; *see also* JA176-178 (report of Riad's expert witness describing the allegedly unauthorized wire transfers).[2]  According to Riad, he learned about these transfers in late January 2011, when he "saw [them] on [Mr. Randolph's] screen" during a visit to the Kennett Square branch.  JA440-441.  Riad immediately complained about the unauthorized

---

[1] The Kennett Square branch was originally operated by First Union Bank.

[2] Riad claims it is "undisputed" that these wire transfers were not authorized.  *See* Br. at 8; *see also id.* at 9 (stating that Wells Fargo "did not dispute" that Riad "did not sign [one of the] wire [authorization forms,] and that the signature that appears on the wire must thus have been forged").  To be clear, the Bank did not dispute whether Riad authorized the relevant wires *for purposes of summary judgment only.* The Bank has not conceded this or any other disputed fact.

wires to Mr. Randolph, who told him the transfers would be investigated and any improperly transferred funds would be returned to his account.  JA440-441.

On January 28, 2011, Riad sent a letter to the Bank, demanding that the wired funds be returned.  JA160.  The letter stated:

> My name is Joseph Riad and I am writing you this letter because I have spoken to my branch manager Triandos Randolph and he has given me this address to write to for follow up on the wire transfers that were sent while I was traveling overseas.  I was told that someone at the branch made mistakes during my travel and sent these wire transfers out.  I have demanded reverse wires and I was told that this was done.  I was also told that you would re-credit my account pending the investigation of these mistakes.
>
> I have been promised that this problem will be resolved quickly and yet I am not seeing any results.  Please look into this matter immediately as this is a huge amount of money over a million dollars.  Please give me a call back or email me . . . to update me on your progress on this urgent matter.

JA160.  In 2011 and 2012, Riad followed up several times with Mr. Randolph, who told him the Bank was investigating and "promis[ed]" the issue would "get resolved."  JA438; *see also* JA527-553 (affidavit of Hossam Ghonem, stating he witnessed one phone call and one meeting between Riad and Mr. Randolph in 2011 and 2012); JA534-538 (affidavit of Ayman Bekheit, stating he accompanied Riad to the branch four times in 2011 and 2012, where Riad inquired with Mr. Randolph about the wire transfers); JA541 (affidavit of Adam Gouda, stating he overheard a call between Riad and Mr. Randolph "[i]n or around 2011 or 2012").

Riad continued to follow up with Mr. Randolph about the wire transfers until Mr. Randolph left the Kennett Square branch in or around 2014.  JA438.  Riad then raised the issue with another branch manager, who told him he needed to "revert back" to Mr. Randolph.  JA438.  Other than his January 2011 letter, Riad never tried to contact anyone else at Wells Fargo about the $1 million allegedly wired from his account without his consent.  JA438.

*Allegedly Mishandled Cashier's Checks, Deposits, and Debit:*  Riad also contends that Wells Fargo mishandled certain cashier's check, deposit, and debit transactions, allegedly resulting in a loss of more than $4.8 million.

Although these errors purportedly occurred between 2010 and 2012, Riad claims he did not discover them until mid-to-late 2015.  *See* Br. at 19.  Riad contends that he received in November 2014 a letter from Wells Fargo stating that several of his accounts would be closed.  JA436-437.  Soon after, a Kennett Square branch manager told Riad he would receive a check for any funds remaining in those accounts.  JA437.  Between six and twelve months later (i.e., between May and November 2015), Riad received a check for around $50,000.  JA437.  Riad claims that he believed his balances should have been significantly higher—more than $6 million.  JA437.  According to Riad, the smaller-than-anticipated check was his first indication that the Bank had mishandled millions of dollars' worth of transactions

several years before.[3]  JA437.

Riad's timeline is contradicted by both common sense and the record, which reflects that (1) between 2011 and 2015, Riad regularly checked his account balances in person at the Kennett Square branch, JA441; (2) Riad complained to a Kennett Square branch manager in 2012 that the Bank had mishandled certain cashier's checks, JA139; and (3) Wells Fargo mailed monthly statements to the addresses identified on Riad's accounts, JA221-222; *see also* JA326-328 (Ms. Schepperd testifying that she received statements at her home address, where Riad also sometimes lived).

The undisputed evidence also proves that Wells Fargo did *not* mishandle the cashier's check, deposit, or debit transactions at issue.

Cashier's Checks:  Riad contends that Wells Fargo "failed to credit him" with $1.1 million in connection with "a series of cashier's check transactions between December 2011 and February 2012."  Br. at 17.  Initially, it is not clear which transactions Riad challenges on appeal.  At the district court, Riad claimed the Bank mishandled five cashier's checks.  JA177-178.  The record reflects the following

---

[3] Riad contends on appeal that, in November 2014, he was "shown an on-screen balance of $2.4 million in his checking account and $3.8 million in his savings account."  Br. at 18-19 (citing JA437).  But the cited deposition testimony says no such thing. *See* JA437 (Q: "And did you ask to see a screen at that point?"  A: "Well, at that point, he said to me that I was going to receive a check from the bank; they're going to mail me a check.  And that was it.").  Riad's testimony does not specify when or how he came to believe his balances exceeded $6 million.

related to these transactions:

- The first three cashier's checks were bought from the 1413 Account in December 2011, but were redeposited into that account "within minutes" of purchase. JA177 (report of Riad's expert); JA303 (deposition of Riad's expert). At his deposition, Riad confirmed that these checks had been purchased with his consent "as proof of funds for potential investments." JA177.

- The fourth cashier's check—for $1.1 million—was bought from Riad's 1413 Account on December 23, 2011. JA177. That same day, it was deposited into Riad's 7764 Account, which he held jointly with his ex-wife. JA177.

- The fifth cashier's check—also for $1.1 million—was issued in Riad's name on February 24, 2012. JA178. The reverse of this check shows Riad executed it "for deposit only" and has a stamp reflecting it was deposited at PNC Bank on February 27, 2012. JA217. Riad confirmed it was "possible" he deposited this check into his PNC account, and also that he was no longer asserting a claim for this check. JA95, JA138; *see also* JA301-302 (Riad's expert noting that Riad's testimony would change his conclusion that the $1.1 million from the February 2012 check was "not traceable").

Riad testified that he complained to a Kennett Square branch manager about these cashier's check transactions once in 2012. JA139. He made no further inquiries of anyone at Wells Fargo about these cashier's checks. JA139-140.

Deposits: Riad also claims Wells Fargo failed to credit his account with two deposits—one for more than $2.5 million on November 10, 2010 and one for $1.1 million on January 19, 2012. Br. at 17. There is no evidence that either of these "phantom" deposits occurred.

The parties agree that $2.5 million was transferred or deposited into Riad's

1413 Account on November 10, 2010.  JA94, JA227.  Riad claims that he also deposited an *additional* $2,500,688 that day, which Wells Fargo failed to properly credit to his account.  JA94, JA305.  There is no evidence of any deposit slip, receipt, or account statement supporting this allegation.  JA221.  Riad points only to a "cash in debit" teller slip, which purportedly reflects a $2,500,688 deposit into an account identified with the numbers "0092."  JA305.  Neither Riad nor Riad Holdings owns a Wells Fargo deposit account beginning or ending with 0092.  JA220.  The record evidence also shows that this teller slip does not reflect any single deposit—it is an internal Bank record documenting four separate deposits made *through teller 0092* on November 10, 2010, which in aggregate total $2,500,688.  JA220-221, JA227.  Riad's expert agrees that this evidence disproves Riad's claim that he deposited $2,500,688 into a Wells Fargo account on November 10, 2010.  JA292-296.

There is also no evidence that Riad deposited $1.1 million on January 19, 2012.  Riad's only evidence of this alleged deposit is an unstamped, handwritten "Transaction Record" purportedly reflecting a deposit made to an account identified with the numbers "169."  JA90-91, JA307.  Neither Riad nor Riad Holdings owned a Wells Fargo deposit account beginning or ending with 169 until nearly a year *after* the $1.1 million deposit was allegedly made.  JA220, JA224 (showing an account beginning with "169" was opened on January 11, 2013); *see also* JA299 (Riad's expert agreeing that Riad's only account beginning or ending with "169" was opened

after this alleged deposit occurred).  There is also no account statement, receipt, or stamped deposit slip reflecting this deposit into any of Riad's Wells Fargo accounts. JA220.

Debit:  Finally, Riad claims that, on February 27, 2012, more than $140,000 was debited from an account ending in -7416 ("7416 Account") without his consent. Br. at 17.  But the undisputed evidence proves that the 7416 Account does not belong to Riad or Riad Holdings.  JA224.

***Irrelevant Unauthorized Account Allegations:***  At the district court, Riad also claimed that certain Wells Fargo accounts had been opened in his name without his consent.  JA4-6.  These allegations are not relevant on appeal, because all claims arising from the allegedly unauthorized accounts were resolved at the district court. *See infra* at 12 n.5; *see also* Br. at 30-31.  For this reason, Riad's allegations about his allegedly unauthorized accounts are irrelevant—as is his misleading, inflammatory discussion of unrelated unauthorized account issues and other purported "fraud" or "abuse." *See* Br. at 6, 18-27.

## II.    Procedural History

Riad sued Wells Fargo in federal district court on September 18, 2019. *See* Dkt. No. 1, *Riad v. Wells Fargo Bank, N.A.*, No. 2:19-cv-04292 (E.D. Pa.).[4]  He asserted six claims based on the allegedly improper wire transfers and mishandled

---

[4] Citations to the district court docket are hereinafter indicated as "Dkt. No. ___."

cashier's checks and deposits, as well as certain allegedly unauthorized account activity. Riad brought claims for (1) negligence; (2) negligent hiring and retention; (3) conversion; (4) breach of contract; (5) unjust enrichment; and (6) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). The longest limitations period for any of Riad's claims is six years. *See* Br. at 27-28.

After the close of discovery, Wells Fargo moved for summary judgment. *See* Dkt. No. 50. The Bank contended that Riad's claims were time-barred, because they accrued more than six years before he filed suit in September 2019. *See id.* at 3-16. It also argued that summary judgment was appropriate on the merits. *See id.* at 16-25. For example, the Bank pointed to undisputed record evidence—including the written report and deposition testimony of Riad's expert witness—showing that Riad suffered no losses related to the cashier's checks, deposits, and debit at issue. *See id.* at 16-22. The Bank also argued that Riad failed to proffer sufficient evidence to survive summary judgment on his breach of contract, conversion, and UTPCPL claims. *See id.* at 22-25.

The district court granted summary judgment on Riad's claims arising from the allegedly improper wire transfers and mishandled cashier's checks and deposits. JA3-61. It held that these claims were barred by the applicable statutes of limitations, because they accrued *at the latest* by December 2012—nearly seven

years before Riad filed suit.  JA20, JA27, JA33.  The court rejected Riad's argument

that the limitations periods were equitably tolled or estopped, explaining that Riad

offered no evidence—much less "clear, precise, and convincing evidence"—that

Wells Fargo had used "fraud or concealment" to "cause [Riad] to relax his vigilance

or deviate from his right of inquiry into the facts," or that any other "extraordinary

circumstances" had prevented him from timely filing suit.  JA17-19.  The court also

held that the applicable statutes of limitations were not tolled by the "discovery rule,"

because Riad knew or reasonably should have known about his injuries at or near

the time they occurred in 2011 and 2012.  JA21.  Finally, the court held that Riad's

claims were not tolled by Riad's September 2016 state court action against Wells

Fargo raising similar allegations and claims.[5]  JA54-57 (citing *Bush v. City of

Pittsburgh*, 813 F. App'x 767, 769 (3d Cir. 2020) ("The tolling of a claim by virtue

of its initiation in state court does not transfer to claims subsequently brought in

federal court.")).  Because the court granted relief in Wells Fargo's favor on statute

of limitations grounds, it did not address the Bank's other arguments for summary

judgment.  *See generally* JA3-60.

　　　　Riad appealed.  JA1.

---

[5] Although the district court held that most of Riad's unauthorized account claims
were untimely, it denied summary judgment as to the UTPCPL claims for accounts
closed on or before September 19, 2014.  JA47-49.  Following this decision, the
parties settled these claims.  JA668-669.

### III.   Rulings Presented for Review

Riad appears to suggest that all of the district court's rulings are at issue on appeal, *see* Br. at 28-30, but he challenges only two:

*First*, Riad claims the district court erred by ruling that Mr. Randolph's alleged "promises" that the Bank was "investigating" the allegedly unauthorized wire transfers did not constitute "fraud or concealment" that equitably estopped Wells Fargo from asserting the statutes of limitations in defense of Riad's wire transfer claims. *See* Br. at 31-32.

*Second*, Riad claims that the district court erred by ruling that Riad could not toll the statutes of limitations on his cashier's check, deposit, and debit claims under Pennsylvania's "discovery rule," because the undisputed evidence reflected that Riad discovered these alleged errors soon after they occurred. *See* Br. at 29-30.

### SUMMARY OF THE ARGUMENT

Riad's claims are time-barred. Riad does not dispute that he was injured (if at all) between 2010 and 2012, more than seven years before he sued Wells Fargo in the district court. The longest limitations period available to Riad is only six years. Thus, as the district court held, Riad's claims were filed too late. This Court should affirm.

On appeal, Riad argues that his claims are timely for two reasons, neither of which stands up to scrutiny. *First*, Riad contends that Wells Fargo is equitably

estopped from asserting a statute of limitations defense to his wire transfer claims, based on his testimony that he delayed suing based on a branch manager's "promise" that the Bank was "investigating" and would return any improperly wired funds. Even taken as true, Riad's proffered evidence does not constitute "clear, precise, and convincing evidence" that Wells Fargo, "through fraud or concealment," caused Riad "to relax his vigilance or deviate from his right of inquiry." *Nesbitt v. Erie Coach Co.*, 204 A.2d 473, 475 (Pa. 1964). Nor does it reasonably justify Riad's failure to pursue his claims for the better part of a decade—particularly given his sophistication and litigiousness, both of which show that Riad was at all times more than capable of timely vindicating his rights.

*Second*¸ Riad contends that his cashier's check, deposit, and debit claims were tolled by the "discovery rule," because he did not learn about his alleged injuries until 2015. But the discovery rule tolls a statute of limitations only when a party cannot discover his injuries despite using *reasonable diligence*. The record reflects no such diligence by Riad. Indeed, no reasonable juror could credit Riad's highly implausible story, which insists that Wells Fargo did not credit nearly $5 million to his accounts between 2010 and 2012, yet for the next four years reflected those sums as having been properly credited in all of the on-screen balances Riad viewed during his twice weekly visits to the Kennett Square branch. The record contains no evidence that Riad acted with the "attention, knowledge, intelligence and judgment"

14

needed to protect his interests under the circumstances.  The discovery rule thus cannot save his claims.  *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005).

Finally, this Court may alternatively affirm summary judgment on any basis in the record, including Wells Fargo's arguments that several of Riad's claims fail as a matter of law based on undisputed evidence disproving the basic elements of those claims.

## STANDARD OF REVIEW

This Court "review[s] an order granting summary judgment de novo, applying the same standard used by the District Court." *Azur v. Chase Bank, USA*, 601 F.3d 212, 216 (3d Cir. 2010).  Summary judgment is appropriate when the record evidence "show[s] there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Nicini v. Morra*, 212 F.3d 798, 805-06 (3d Cir. 2000) (citing Fed. R. Civ. P. 56(c)).

"Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999).  The Court should draw all reasonable inferences in favor of the nonmoving party, but "[s]peculation and conclusory allegations do not satisfy [the nonmoving party's] duty." *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).  A

genuine factual dispute exists only if "the evidence is sufficient for a reasonable factfinder to return a verdict for the nonmoving party." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016); *see also id.* ("[A] mere 'scintilla of evidence' in the nonmovant's favor does not create a genuine issue of fact, and the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment.")

This Court can affirm summary judgment "on any grounds supported by the record," even if the district court did not consider or decide the issue. *Nicini*, 212 F.3d at 805; *see, e.g.*, *Azur*, 601 F.3d at 214-16 (affirming summary judgment on "partly different grounds").

## ARGUMENT

### I.    Riad's claims are time-barred.

The parties agree Riad's claims are subject to two-, four-, and six-year statutes of limitations under Pennsylvania law. *See* Br. at 27-28; *see also* JA10-11. The parties also agree that, under Pennsylvania law, the statute of limitations "begins to run as soon as the right to institute and maintain a suit arises," which is generally when the injury first occurs. *See* Br. at 37 (citing *Fine*, 870 A.2d at 857). "[L]ack of knowledge, mistake, or misunderstanding do not toll the running of the statute of limitations, even though a person may not discover his injury until it is too late to

take advantage of the appropriate remedy." *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983).

Riad does not dispute that his alleged injuries occurred between late 2010 and early 2012—more than seven years before he sued Wells Fargo in the district court. *See* Br. at 10, 17, 27. Even so, Riad insists that his claims are timely under certain exceptions to general statute of limitations principles, including "equitable estoppel" and the "discovery rule." *See id.* at 31-37.

In opposing Wells Fargo's motion for summary judgment, Riad failed to produce sufficient evidence showing that either exception saves his claims. Because Riad's claims are time-barred, this Court should affirm the district court's decision granting summary judgment to Wells Fargo.

### A. The limitations periods on Riad's wire transfer claims were not equitably estopped by any purported "promise" by the Bank.

Riad first contends that the doctrine of equitable estoppel bars Wells Fargo from invoking the statute of limitations as a defense due to Mr. Randolph's alleged "promise" that the Bank was investigating his claims and would return any wires it found unauthorized. *See* Br. at 39-49.

The doctrine of equitable estoppel (sometimes called "fraudulent concealment") provides that a defendant is barred from invoking the statute of limitations when, "through fraud or concealment," he "causes the plaintiff to relax his vigilance or deviate from his right of inquiry" until after the limitations period

has run.[6] *Nesbitt*, 204 A.2d at 475; *see also Rice v. Diocese of Altoona-Johnstown*, 255 A.3d 237, 247-48 (Pa. 2021).  Equitable estoppel does not require a defendant to have engaged in "fraud or concealment in the strictest sense, that is, with an intent to deceive; unintentional fraud or concealment is sufficient." *Rice*, 255 A.3d at 248. But "mere mistake, misunderstanding, or lack of knowledge is insufficient" to support a finding of equitable estoppel, *id.*, as are simple promises to pay or "mere negotiations toward an amicable settlement" of disputed claims, *Nesbitt*, 204 A.2d at 475.

A party asserting equitable estoppel must prove "the existence of such fraud or concealment . . . by evidence that is clear, precise and convincing." *Nesbitt*, 204 A.2d at 475.  "Whether an estoppel results from established facts is a question for the determination of the court." *Id.* at 476.  Although "[i]t is for the jury to say whether alleged remarks were made," the court must decide "whether they are susceptible of the inferences attributed to them." *Id.*

Moreover, under Pennsylvania law, a plaintiff must prove "reasonable diligence" before it may invoke equitable estoppel. *Fine*, 870 A.2d at 861; *see also Rice*, 255 A.3d at 253 ("Under our jurisprudence, before a plaintiff may invoke the principles of fraudulent concealment, the plaintiff must use reasonable diligence to

---

[6] The related but distinct "discovery rule" applies when an injured party, "despite the exercise of reasonable diligence," is unable "to know that he is injured and by what cause." *Fine*, 870 A.2d at 858; *see also infra* at 24-28.

investigate her claims."). "Even affirmatively misleading acts do not estop a defendant from invoking the statute of limitations if the party has failed to act with reasonable diligence" to investigate and pursue his claims. *Rice*, 255 A.3d at 249. Whether a plaintiff exercised "reasonable diligence" may involve questions of fact, but where "reasonable minds would not differ," the court can decide the issue as a matter of law. *Fine*, 870 A.2d at 858-61.

Riad concedes he knew about his injury no later than January 28, 2011, when he wrote to Wells Fargo demanding that the improperly wired funds be returned to his accounts. *See* Br. at 40; JA160.  In his letter, he insisted that the "huge amount" of wired funds be returned immediately, and complained that, despite his inquiries with Mr. Randolph, he was not "seeing any results." JA160.

Riad concedes that, despite having acknowledged in January 2011 a pressing need for immediate resolution and return of the wired funds, he waited nearly a decade to sue the Bank in the district court. *See* Br. at 27.  Riad claims that Wells Fargo should still be equitably estopped from asserting a statute of limitations defense, because the Bank "made promises until 2016 that it was continuing its efforts to reverse the wires, asked him to be patient with the process, and assured him that it would credit the wired amounts upon conclusion of the reverse-wire process." Br. at 40.  Riad cites the following evidence in support of this narrative:

- Riad's testimony recounting one conversation with Mr. Randolph in January 2011, during which Mr. Randolph said the Bank "would do

an investigation, and then . . . they would re-credit the account." JA440;

- Affidavits from three of Riad's friends, each claiming to have observed one or more conversations between Riad and Mr. Randolph in 2011 or 2012, during which Mr. Randolph "promised" that improperly wired funds would be credited to Riad after the Bank completed its investigation.  JA527-533, JA534-538, JA539-542; and

- Riad's testimony that, for next five years, he "follow[ed] up" on some unspecified occasions with Mr. Randolph, who "promis[ed] continuously that [the wire transfer issue] was going to get resolved."  JA438.

*See id.* at 10-14.

Even accepted as true, this evidence does not constitute "clear, precise and convincing" proof that Wells Fargo, "through fraud or concealment," caused Riad "to relax his vigilance or deviate from his right of inquiry."  *Nesbitt*, 204 A.2d at 475.    At best, Mr. Randolph's statements reflect that (1) Wells Fargo was investigating the allegedly improper wire transfers, and (2) *if* the investigation found that any funds had been improperly wired, those funds would be returned to Riad. In other words, the alleged statements expressly conditioned any potential refund on the yet-unknown outcome of the Bank's ongoing investigation—and left open the possibility that Riad would receive no refund at all.  That does not even rise to the level of a "promise to pay," which Riad acknowledges would be insufficient to toll the limitations period.  Br. at 40.  They likewise create an inherent conflict between the demands in Riad's January 2011 letter to Wells Fargo—i.e., immediate payment

of a "huge amount" of money—and the Bank's actions in investigating the allegedly improper transfers before determining whether *any* funds should be refunded to Riad.

Given this context, no one could reasonably interpret Mr. Randolph's alleged statements as unequivocal "promises" guaranteeing the wired funds would be returned—and certainly not someone with Riad's business savvy and litigation experience. *See supra* at 2-3. Because Mr. Randolph's alleged statements are not "susceptible of the inferences [Riad] attribute[s] to them," equitable estoppel does not apply.[7] *Nesbitt*, 204 A.2d at 475.

The cases cited by Riad do not suggest otherwise. In all of them, concrete, unequivocal promises about future payments or other conduct directly led to the plaintiff foregoing timely assertion of his or her claims. *See Nesbitt*, 204 A.2d at 474-77 (insurance adjuster told plaintiff the defendant would pay her hospital bills and withheld insurer's position on liability until after limitations period expired); *see also Dep't of Pub. Welfare v. UEC, Inc.*, 397 A.2d 779, 784 (Pa. 1979) (high-ranking officials repeatedly confirmed agency would pay plaintiff under parties' contract); *Colbert v. Boazzo*, 45 Pa. D. & C. 4th 370, 375 (Pa. Ct. Com. Pleas 2000) (insurance

---

[7] Riad insists that the record contains disputed facts about the nature of Mr. Randolph's statements, which a jury should resolve. *See* Br. at 44-45. But whether equitable estoppel applies is a legal question that the court must decide. *See Nesbitt*, 204 A.2d at 476. Here, even when viewed in the light most favorable to Riad, the record evidence of Mr. Randolph's statements supports no such finding.

adjustor incorrectly implied two-year limitations period would be tolled pending receipt of medical examination report); *Dep't of Pub. Welfare v. Soffer*, 544 A.2d 1109, 1110 (Pa. Commw. Ct. 1988) (defendant told plaintiff that disputed invoices could be resubmitted outside statutory claim period).[8]   And in these cases, the plaintiff sought a *modest* extension of the limitations period based on his or her reasonable reliance on the defendant's unambiguous promises.   *See Nesbitt*, 204 A.2d at 474 (seeking to extend two-year statute of limitations by approximately six months); *UEC*, 397 A.2d at 784 (seeking to extend six-month claims period by approximately one year); *Colbert*, 45 Pa. D. & C. 4th at 371-76 (seeking to extend two-year statute of limitations by approximately four months); *Soffer*, 544 A.2d at 1110 (seeking to extend six-month claims period by less than three months).   None of these cases suggests a plaintiff can delay pursuing his legal rights for nearly a decade based on vague, unverified statements related to the conditional possibility of future payment.

---

[8] The out-of-state cases cited by Riad also involve concrete promises of future payment, not mere suggestions that payment *might* occur depending on the outcome of future events.  *See Langdon v. Langdon*, 117 P.2d 371, 373 (Cal. App. 1941) (defendant promised to pay in three years, after his business was established); *Kreielsheimer v. Berryman*, 147 P. 871, 872 (Wash. 1915) (defendant promised to pay after resolution of suit against debtor); *Rice v. Granite Sch. Dist.*, 456 P.2d 159, 161 (Utah 1969) (defendant promised compensation as soon as total damages were established).

Moreover, Riad's own evidence shows that he failed to exercise "reasonable diligence" to investigate his injury and pursue his rights. *See Fine*, 870 A.2d at 861. Even when viewed in the light most favorable to him, the evidence reflects that Riad knew in January 2011 that more than $1 million had been wired out of his accounts without his authorization. Indeed, he sent a letter to Wells Fargo demanding immediate payment of these funds. JA160. Yet he did nothing to redress this purported loss for nearly a decade other than at times "following up" with Mr. Randolph—the very person he now blames for the "patently unauthorized" transfers. *See* Br. at 25. Riad admits he made no effort to contact anyone else at Wells Fargo to ask about the transfers or otherwise verify Mr. Randolph's statements about the Bank's "reverse-wire" process.[9] JA438. And none of the other evidence cited by Riad (such as the status of the banking system in Burkina Faso or Wells Fargo's history as a national bank, *see* Br. at 14-16, 46) excuses his years of inaction.

Because no reasonable juror could conclude from the record that Riad acted with appropriate diligence under the circumstances, Riad cannot invoke equitable estoppel. *See Mest v. Cabot Corp.*, 449 F.3d 502, 516 (3d Cir. 2006) (explaining that, under fraudulent concealment doctrine, "[w]here common sense would lead the

---

[9] At the district court, Riad cited phone records purporting to reflect calls made to Wells Fargo and other entities during the relevant period. *See* Dkt. No. 52. But these records say nothing about the nature or substance of those calls, and Riad's own testimony confirms that his only efforts to "follow up" about the wires were periodic inquiries to Mr. Randolph.

plaintiff to question a misrepresentation, the plaintiff cannot reasonably rely on that misrepresentation") (applying Pennsylvania law). [10]

**B.    The limitations periods on Riad's cashier's check, deposit, and debit claims were not tolled by the "discovery rule."**

Riad next contends that his cashier's check, deposit, and debit claims are not time-barred under the "discovery rule," which provides that the statute of limitations does not begin to run until a plaintiff knows, or reasonably should know, that he has been injured by another party's conduct. *See Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir. 1991). To invoke this rule, Riad claims that he first learned the Bank mishandled nearly $5 million in cashier's checks, deposits, and debits in mid-to-late 2015, when he received a smaller-than-anticipated check after his accounts were closed. According to Riad, the statute of limitations did not begin to run until this date.

The discovery rule "does not permit the victim of an alleged wrong to postpone the running of the statute of limitations by willfully closing his eyes, ostrich-like, to a known probability that he has been injured, even if he is not

---

[10] Riad suggests the district court "fundamental[ly] misunderstand[s]" the applicable legal doctrines because it held that the "discovery rule" did not toll the limitations period on his wire transfer claims. *See* Br. at 47-48 (citing JA19-20). To be clear, this portion of the court's opinion addresses arguments raised *by Riad*, which did not distinguish between the discovery rule, equitable estoppel, and equitable tolling. *See* Dkt. No. 52 at 57. Moreover, setting aside any doctrinal quibbles, Riad agrees that his wire transfer claims are not subject to tolling under the discovery rule based the date he admittedly discovered his alleged injury. *See* Br. at 47.

certain." *United States v. Duke*, 229 F.3d 627, 630 (7th Cir. 2000).  So "[t]he 'polestar' of the discovery rule is not the plaintiff's actual knowledge, but rather 'whether the knowledge was known, or through the exercise of diligence, knowable to [the] plaintiff.'"  *Bohus*, 950 F.2d at 925.  The "reasonable diligence" test is an objective one, which accounts for "the capacity [of the plaintiff] to meet certain situations and the circumstances confronting them at the time in question."  *Fine*, 870 A.2d at 858.  Thus, to benefit from the discovery rule, Riad "bears the burden of demonstrating that he exercised reasonable diligence in determining the existence and cause of his injury."  *Mest*, 449 F.3d at 511 (applying Pennsylvania law).  To do so, he must "establish that he exhibited those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others."  *Wilson v. El-Daief*, 964 A.2d 354, 363 n.6 (Pa. 2009).

Riad contends that he did not discover his alleged injuries until "November or December of 2015," because he was previously "shown account balances that did not reflect the improprieties."  Br. at 50.  Specifically, Riad claims that, in or around November 2014, he visited the Kennett Square branch and reviewed on-screen balances for his accounts totaling more than $6 million, which led him to believe

that the transactions at issue had been properly credited to his accounts. [11] *See id.*; JA437. But these transactions allegedly occurred years earlier, in 2011 and 2012. *See supra* at 4-10. And Riad testified that, throughout this period, he visited the branch "[a]t least twice a week" to check his balances on the branch manager's computer screen. *See supra* at 4. Indeed, Riad insists this is how, in January 2011, he discovered that more than $1 million had been wired from his accounts without his consent. *See id.*

It is highly implausible that Riad's on-screen balances *accurately* reflected $1 million in improper wire transfers yet also *inaccurately* reflected $4.8 million in deposits that were not actually credited to his account. At summary judgment, the Court must accept all "justifiable" inferences in Riad's favor—but it need not credit his implausible and self-serving interpretations of the evidence. *See United States v. Premises Known as 717 S. Woodward St., Allentown, Pa.*, 2 F.3d 529, 533 (3d Cir. 1993) ("[I]f the nonmoving party's evidence, when viewed in the context of all of the evidence, could not be credited by a rational juror, summary judgment may be granted."); *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998) ("A denial of knowledge may be so utterly implausible in light of conceded or irrefutable evidence that no rational person could believe it; and if so, there is no occasion to submit the

---

[11] As explained *supra* at 7 n.3, Riad did not actually testify that he viewed on-screen balances in excess of $6 million during this visit, as he now claims.

issue of knowledge to determination at a trial.").

Nor is there any question that any alleged injuries stemming from the cashier's checks, deposits, and debit transactions would have been "through the exercise of diligence, knowable to [Riad]" at or soon after the transactions occurred. *Bohus*, 950 F.2d at 925. Riad had access to multiple sources of information other than on-screen balances that could be used to verify whether the challenged transactions had been properly credited to his accounts. The record contains evidence that monthly account statements were mailed to Riad at the address associated with his accounts. *See* JA221-222; *see also* JA326-328. Riad also had access to other means by which to access and review his account balances in real time. *See, e.g.*, JA441 (Riad testifying that he knew he could check his balances via the ATM). Yet for more than three years, he took no such reasonable steps to confirm that millions of dollars had been properly credited to his accounts.

No reasonable juror could conclude that Riad's years of inattention reflect "qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests." *Wilson*, 964 A.2d at 363 n.6. All the more so since Riad supposedly knew that more than $1 million had been improperly wired from his accounts through Bank error and had not yet been returned—information that would have prompted any reasonable person to monitor his accounts and transactions closely going forward. Because Riad failed to take

reasonable steps to timely identify his alleged injuries related to the cashier's check, deposit, and debit transactions, he has failed to carry his burden to prove that the statute of limitations on those claims should be tolled by the discovery rule.

## II.    Several of Riad's claims also fail on the merits.

At the district court, Wells Fargo also argued that it was entitled to summary judgment on the merits of several of Riad's claims.  Having concluded that Riad's claims were time-barred, the district court did not decide these issues, but this Court can in the alternative affirm summary judgment on these grounds.  *See Nicini*, 212 F.3d at 805 (explaining that an appellate court can affirm a grant of summary judgment "on any grounds supported by the record," even if the district court did not consider or decide the issue below).

### A.    The undisputed record evidence—including the testimony of Riad and his expert—proves Riad suffered no losses related to the cashier's checks, deposits, or debit transactions.

Riad asserts claims based on Wells Fargo's alleged mishandling of five cashier's checks, but the undisputed record shows that Riad suffered no losses related to any of these transactions.  Indeed, Riad's own expert determined, based on his review of the relevant cashier's checks and account statements, that the first four cashier's checks challenged by Riad were accepted for deposit in accounts he owned.  *See supra* at 8.  The first three were re-deposited into the 1413 Account within minutes of being withdrawn, and the fourth was credited to the 7764 Account,

which was co-owned by Riad and his ex-wife.  *See id*.  Riad also concedes that the fifth check was issued in his name, and that he executed it "for deposit only" a few days later.  *See id*.  Riad acknowledged it was "possible" he deposited this check into his PNC account, as reflected by the stamp on the reverse of the check, and agreed that he was not asserting any claim in connection with this check.  *See id.*

Riad also seeks to recover based on two deposits that were allegedly not properly credited to his accounts.  Again, the record disproves these claims.  Riad first contends that he made a $2,500,688 "deposit" on November 10, 2010; however, the record evidence shows this deposit never occurred.  Riad's only evidence is an internal Wells Fargo "Deposit Slip."  *See supra* at 9.  But this document does not reflect *any* single deposit—much less one by Riad.  Instead, it documents four deposits made by multiple customers through bank teller 0092, with a total value of $2,500,688.  *See id.*  Riad's expert confirmed that this evidence disproves Riad's claim.  *See id.*

Riad's claim that Wells Fargo also failed to credit a $1,100,000 deposit—purportedly deposited on January 19, 2012 into an account identified with the numbers "169"—likewise fails.  The undisputed evidence shows that neither Riad nor Riad Holdings had an open deposit account with Wells Fargo on this date.  *See supra* at 9-10.  Indeed, the only account owned by Riad with these digits was opened

in January 2013—nearly a *year* after the alleged deposit was supposedly made. *See id.*

Finally, Riad contends that he suffered a loss related to a debit of $143,525.29 from the 7416 Account. *See supra* at 10. But the 7416 Account is owned by non-party Michelle Schepperd, Riad's ex-wife. Riad has never had any ownership interest in this account. Riad lacks standing to assert a claim to recover funds allegedly debited from an account that he does not own.

As a result, if this Court finds this claim is not time-barred, it should affirm the district court's decision awarding summary judgment to Wells Fargo based on the undisputed record evidence confirming that Riad suffered no losses related to the cashier's check, deposit, and debit transactions at issue.

### B.    Riad's breach of contract claim fails because there is no contract.

Under Pennsylvania law, parties asserting claims for breach of contract must prove, among other things, "the existence of a contract, including its essential terms." *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). Riad's breach of contract claim fails because he insists that he never signed a contract with Wachovia or Wells Fargo. JA251-256.

Riad testified at his deposition that his contract claim was based on "standard" terms and "common sense." JA253-254. But Riad cannot sue on implied contractual duties based on "standards" without an express contract under which

those implied duties arise. *See, e.g.*, *Pinnix v. Fielding Inst.*, 53 F. App'x 204, 205

(3rd Cir. 2002) (affirming no implied covenants if no contract exists). Because the

undisputed evidence shows there is no contract between the parties, the Court should

affirm summary judgment to Wells Fargo on Riad's breach of contract claim.

## CONCLUSION

For all of these reasons, this Court should affirm the district court's decision

awarding summary judgment to the Bank.

Dated: October 13, 2022                    Respectfully submitted,

*s/ Jarrod D. Shaw*
Pa. Bar No. 93459

Jarrod D. Shaw
MCGUIREWOODS LLP
260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222
T: (412) 667-7907
F: (412) 402-4193
jshaw@mcguirewoods.com

Ashley P. Peterson
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-1190
F: (804) 698-2091
apeterson@mcguirewoods.com

*Counsel for Appellee*
*Wells Fargo Bank, N.A.*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

- This brief contains 7,594 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because:

- This brief has been prepared in a proportionally spaced 14-point Times New Roman font using Microsoft Word.

The text of the electronic brief is identical to the text in the paper copies.

At least one of the attorneys whose names appear on this brief is a member of the bar of this Court.

The electronic version of this brief has been scanned for viruses using CrowdStrike Falcon Sensor, Version 6.40.15406.0, and no virus was detected.


*s/ Jarrod D. Shaw*
Jarrod D. Shaw

*Counsel for Appellee*
*Wells Fargo Bank, N.A.*

# CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2022, the foregoing was filed with the Clerk of the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system, which will also serve counsel of record.

*s/ Jarrod D. Shaw*
Jarrod D. Shaw

*Counsel for Appellee*
*Wells Fargo Bank, N.A.*